# EXHIBIT A

# Arizona Rangers

## DISPUTE RESOLUTION, BINDING INDIVIDUAL ARBITRATION AGREEMENT, AND WAIVER OF JURY TRIAL

By signing below, the Member hereby agrees that all disputes, no matter how described, pleaded, or styled, between the Member and the Arizona Rangers (the **"Corporation"**) (including its parent and any past or present affiliates, officers, employees, or lenders), including, but not limited to, any dispute relating to any aspect of the Member's relationship with or any act or omission by the Corporation, (**"Claim"**) shall first be resolved by use of the Grievance Resolution procedure outlined in the Arizona Rangers Governing Documents. If the Claim is not resolved, both the Corporation and the Member irrevocably waive their rights to a trial by jury and agree instead to submit all Claims to binding, confidential, individual arbitration before a single, neutral arbitrator under the Federal Arbitration Act (**"FAA"**) conducted by the American Arbitration Association ("AAA") under its Consumer Arbitration Rules (if a claim is initiated prior to the effective date of the Consumer Arbitration Rules, then it shall proceed under the Commercial Arbitration Rules and applicable Supplementary Procedures for Consumer-Related Disputes) ("AAA Rules") and in accordance with the AAA Consumer Due Process Protocol and the terms of this Dispute Resolution, Binding Individual Arbitration Agreement, and Waiver of Jury Trial ("Agreement"). A copy of the applicable AAA Rules and forms may be obtained directly from the AAA at www.adr.org or 800-778-7879. Nothing in this Agreement prohibits the Member from filing a complaint with the state regulatory agency or accrediting agency listed in the Corporation Catalog. In addition, the Member and the Corporation retain their right to seek relief in a small claims court for Claims within the scope of that court's jurisdiction. The parties hereby further agree as follows:

- The FAA (including all its procedural and substantive provisions) and related federal decisional law shall govern this Agreement to the fullest extent possible.

- Except for the parties' right to seek relief in a small claims court as provided in this Agreement, neither party shall file an action in any court against the other, and any such action filed in violation of this Agreement shall be dismissed in favor of arbitration. The parties recognize that the breach of this Agreement will cause the other party damage including, but not limited to, attorneys' fees and costs incurred in compelling arbitration, which the breaching party will be liable for.

- Except as specifically required by law of the State of Arizona in which this Agreement is executed, the fact of and all aspects of an arbitration and the underlying Claim shall remain strictly confidential by the parties, their representatives, the arbitrator, and the AAA.

- Only the arbitrator is authorized to make determinations as to the scope, enforceability, validity, and effect of this Agreement. If any part of this Agreement is found to be invalid or unenforceable, then the parties agree that such specific part or parts shall be of no force and effect and shall be severed, but the remainder of the Agreement shall continue in full force and effect. This Agreement will survive the termination of the member's relationship with the Corporation.

- If arbitration occurs, it shall be conducted at a location convenient to the Member, unless the parties agree otherwise in writing.

- The arbitrator shall have the power to award any remedy that directly benefits the parties to this Agreement (provided the remedy would be available from a court under the law of the applicable jurisdiction) but not the power to award relief for the benefit of anyone not a party to this Agreement. The arbitrator's award shall be final and binding on the parties, but subject to review in accordance with the FAA. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction.

- If the Member initiates arbitration, the Member will be responsible for paying a portion of the AAA filing fee at the time the Claim is filed in an amount equal to $200 or the applicable filing fee of any court in the district in which the Member resides, whichever fee is less. The parties shall bear their own costs and expenses associated with their attorneys, experts, and witnesses, unless the arbitrator determines otherwise in strict accordance with the applicable law.

- This Agreement shall not be modified except by written agreement signed by both parties. Notwithstanding, if the AAA requests the waiver of any provision in this Agreement in order for the Claim to remain before the AAA under the AAA Rules, such provision(s) may be waived unilaterally by the party against whom the Claim is asserted, but such waiver shall be in writing and executed by the party against whom the Claim is asserted (if the Claim is against the Corporation, the waiver must be signed by the State Commander) and specifically identify the provision or provisions being waived. Any such waiver shall not waive or affect any other portion of the Agreement.


_____     _____     _____
Member Name                          Member Signature                     Date


_____     _____     _____
Corporation Representative Name      Corporation Representative Signature  Date


AR Form s-351;rev.01;Jul16

# EXHIBIT B

### Before The American Arbitration Association

| | |
|---|---|
| Grant G. Winthrop, an individual, | |
| *Claimant,* | |
| v. | |
| Arizona Rangers, an Arizona non-profit corporation, | |
| *Respondent.* | |

Claimant Grant G. Winthrop ("Mr. Winthrop") initiates this arbitration against Respondent Arizona Rangers, an Arizona non-profit corporation ("Arizona Rangers") pursuant to a Dispute Resolution, Binding Individual Arbitration Agreement, and Waiver of Jury Trial (the "Arbitration Agreement") entered by the parties.[1]

### I. Introduction.

1.  This action seeks recompense from Arizona Rangers for its fraud and abuse of the legal process against its former member, Mr. Winthrop. Arizona Rangers fraudulently induced Mr. Winthrop to join the organization by blatantly misrepresenting its nature and status. When he departed, it wrongfully instituted legal proceedings against Mr. Winthrop solely for the purpose of obtaining leverage over the Wine Education Council ("WEC") where Mr. Winthrop's father served as general counsel.

2.  Indeed, Jared Simmons, general counsel to Arizona Rangers, called Mr. Winthrop and expressly threatened to initiate litigation against Mr. Winthrop unless he could convince WEC to voluntarily dismiss its claims against Arizona Rangers.

3.  Because Mr. Winthrop did not cave to Arizona Rangers' demands, Arizona Rangers set out on a costly and meritless process to disparage and damage Mr. Winthrop through the guise

---

[1] An unsigned copy of that Agreement is filed with this statement of claims, as required by the AAA rules. Arizona Rangers have previously acknowledged having a copy of the signed agreement which all Rangers are required to sign. As alleged in greater detail below, Arizona Rangers have previously destroyed countless documents relevant to this claim, all of which tended to exonerate Mr. Winthrop.

| | |
|---|---|
| Statement of Claims - 1 | Ard Law Group PLLC |
| *Mr. Winthrop v. Arizona Rangers (Am. Arb. Assoc.)* | P.O. Box 281<br>Kingston, WA 98346<br>Phone: (206) 701-9243 |

of a third-party indemnification claim, presenting the knowingly false allegation that Mr. Winthrop would be financially liable for any damages Arizona Rangers owed to WEC.

4.    Throughout those proceedings, Arizona Rangers misrepresented its own nature and purpose to federal courts, including to the Ninth Circuit Court of Appeals, ensuring that the false statements it made in federal pleadings would preclude Mr. Winthrop from securing admission to a state bar as long as Arizona Rangers continued its campaign against him.

5.    That frivolous legal campaign has now ended, not with a bang but with a whimper. But the years of harassment by Arizona Rangers precluded Mr. Winthrop from securing admission to any state bar. Arizona Rangers knowingly and falsely asserted to federal courts that (a) it was a quasi-governmental police auxiliary, "reporting" to the Governor of Arizona and (b) that Mr. Winthrop had engaged in financial fraud.

6.    Undermining Arizona Rangers' public claims however, was the fact that Arizona Rangers had engaged two CPAs to review Mr. Winthrop's activities.

7.    Those licensed, credentialed professionals had already determined that Mr. Winthrop did nothing wrong when he was a member, and specifically that there was ***no evidence*** that any misappropriation of assets had occurred.

8.    Quite the contrary; they both noted the extraordinary benefits to Arizona Rangers that had flowed from Mr. Winthrop's volunteerism.

9.    Indeed, the sole person on whose evidence Arizona Rangers based its claim that Mr. Winthrop had done anything wrong was Dan Fogelton, Arizona Rangers' Director Of Education.

10.    Arizona Rangers knew Mr. Fogelton could not be trusted.

11.    Arizona Rangers knew that Fogelton had been terminated from federal employment with Bureau of Alcohol, Tobacco, and Firearms for using government computers for child pornography.

STATEMENT OF CLAIMS - 2

*Mr. Winthrop v. Arizona Rangers* (AM. ARB. ASSOC.)

ARD LAW GROUP PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

12. Arizona Rangers knew that Fogelton had been terminated from a subsequent position with the Fort Worth, Texas police department for lying about his termination from the ATF.

13. WEC and Arizona Rangers eventually settled their dispute with Arizona Rangers paying WEC *more* than WEC initially demanded, without any indemnification from Mr. Winthrop.

14. Arizona Rangers nevertheless obtained an erroneous judgment that it was the prevailing party against Mr. Winthrop solely because Mr. Winthrop voluntarily dismissed his remaining compulsory counterclaim against Arizona Rangers to bring an end to the matter.

15. The Arizona District Court's erroneous judgment was vacated by the Ninth Circuit Court of Appeals on June 20, 2024, with the Ninth Circuit concluding: "The Rangers cannot be the successful party because the group did not receive any indemnification or contribution from Mr. Winthrop, which was both the Rangers' primary litigation objective and the impetus for the litigation which prompted Mr. Winthrop's counterclaims."

16. Following remand, the district court entered a corrected judgment on August 28, 2024.

## II. Parties, Jurisdiction, And Venue.

17. Grant G. Mr. Winthrop is an individual domiciled in the state of Wyoming.

18. Arizona Rangers is an Arizona non-profit corporation with its principal place of business in Arizona.

19. This dispute is subject to arbitration pursuant to the American Arbitration Association's ("AAA") Consumer Arbitration Rules according to the Arbitration Agreement entered between the parties. The Arbitration Agreement governs "all disputes, no matter how described, pleaded, or styled, between the Member and Arizona Rangers (the 'Corporation') (including its parent and any past or present affiliates, officers, employees, or lenders), including, but not limited to, any dispute relating to any aspect of the Member's relationship with or any act or omission by the Corporation."

20. Venue is appropriate in the state of Wyoming because it is convenient to Mr. Winthrop, as directed by the Arbitration Agreement.

Statement of Claims - 3
*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC
P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

## III. Factual Background

21.    Mr. Winthrop is an attorney who graduated with his J.D. in 2011. At the time of the events leading to this dispute, Mr. Winthrop was a Donor Advisor for several Donor Advised Funds.

22.    In 2016, while an Arizona resident, Mr. Winthrop was recruited as an Associate Ranger with Arizona Rangers.

23.    Arizona Rangers claim to be a law enforcement support auxiliary reporting to the Governor of Arizona.

24.    However, the organization has never reported to the Governor.

25.    Arizona Rangers primarily performs private security work and partisan election work, not actual law enforcement.

26.    To maintain the façade of quasi-governmental legitimacy, Arizona Rangers have a pseudo-militaristical command structure.

27.    Mr. Winthrop was part of "East Valley Company."

28.    Mr. Winthrop's "commanding officer" was Ranger Jeff East.

29.    Further enhancing its farcical LARPing as a real governmental law enforcement auxiliary, every Ranger takes an oath requiring they respond to the "chain of command."

30.    While Mr. Winthrop volunteered as an Associate Ranger, he was appointed to a special committee known as the Development Committee, which was created by the Board of Governors.

31.    The Development Committee was tasked with developing a strategy for increasing donations to Arizona Rangers to assist with fulfilling its mission.

32.    While a volunteer with Arizona Rangers, Mr. Winthrop approved a series of grant requests he received from Arizona Rangers and recommended that the American Endowment Foundation make the donations to Arizona Rangers.

33.    In total, Mr. Winthrop recommended a total of $175,000.00 in donations to Arizona Rangers.

Statement of Claims - 4

*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

34. Mr. Winthrop made these grants believing they were for charitable purposes, because he believed that Arizona Rangers was, as it falsely claimed, a law enforcement support auxiliary reporting to the Governor of Arizona.

35. Mr. Winthrop had no idea the money would be used for private security work and political electioneering support.

36. Mr. Winthrop relied on the accuracy of the statement that Arizona Rangers was a law enforcement auxiliary reporting to the Governor of Arizona.

37. The donations were subject to certain conditions, which if triggered, would require Arizona Rangers to transfer any unused funds or equipment purchased with the grant funds to a separate 501(c)(3) charity, the Wine Education Council ("WEC"), with which Mr. Winthrop was familiar because his father served as its general counsel.

38. Indeed, the use of the money by Arizona Rangers was not a valid charitable purpose.

39. In late 2017, an internal dispute arose between various Rangers with Arizona Rangers.

40. Given the internal strife within Arizona Rangers, Mr. Winthrop decided to resign as an Associate Ranger, which ultimately triggered Arizona Rangers' obligation to transfer unused funds and remaining equipment to WEC, consistent with the grant terms required by the donors.

41. After Mr. Winthrop's resignation as a volunteer, Arizona Rangers' internal dispute festered, resulting in its Board of Directors authorizing an investigation into the use of the donations received from the American Endowment Foundation at Mr. Winthrop's suggestion.

42. Specifically, Arizona Rangers' Board of Directors appointed a volunteer who is a licensed Arizona CPA as well as a second person, a retired CPA, to conduct the internal investigation into the receipt of and use of the $175,000.00 in grant funds.

43. Arizona Rangers internally referred to the donations as the Grant Program.

44. The CPA licensed investigators had access to all of the information they requested and were also able to interview all persons directly involved in the Grant Program.

STATEMENT OF CLAIMS - 5

*Mr. Winthrop v. Arizona Rangers (Am. Arb. Assoc.)*

ARD LAW GROUP PLLC
P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

45.     On April 25, 2018, after completing their lengthy investigation, the two CPAs issued Arizona Rangers' Grant Program Report to Arizona Rangers' Board of Directors.

46.     According to Arizona Rangers' Grant Program Report: (1) a complete accounting for Grant Program Funds was completed; (2) all fund expenditures were used to benefit Arizona Rangers and in accordance with restrictions imposed by the donors; and (3) no evidence was found that would indicate the existence of a misappropriation of any Arizona Ranger assets by Mr. Winthrop.

47.     The Grant Program also addressed what the two Arizona Rangers' CPAs initially considered might have been a potential conflict of interest, but was clear in relation to Mr. Winthrop that "based on the documentation reviewed and our examination of the Grant Program, there is *no evidence* that a misappropriation of assets has occurred." (Emphasis added.)

48.     While the Grant Program Report exonerated Mr. Winthrop, it did say that Mr. Winthrop's Ranger Jeff East's "lack of oversight represents a failure by the Officers of East Valley Company to meet their fiduciary responsibilities over the possession, use and security over property of Arizona Rangers."

49.     The two CPAs also referenced a separate investigation by Arizona Rangers' East Valley Company's Lt. Doug Sankey.

50.     Sankey's investigation had arrived at the same conclusion and expressly thanked Mr. Winthrop for his significant efforts to benefit Arizona Rangers.

51.     The Arizona Rangers' two CPAs also made an oral report of the Grant Program Report's findings to Arizona Rangers' Board of Directors.

52.     After that report, the Board of Directors thanked Mr. Winthrop for his valuable contributions and efforts to benefit Arizona Rangers.

53.     Around the same time the Arizona Rangers' two CPAs were investigating and exonerating Mr. Winthrop of any wrongdoing, WEC learned that it was entitled to any unused funds and equipment purchased with grant funds.

STATEMENT OF CLAIMS - 6
*Mr. Winthrop v. Arizona Rangers* (AM. ARB. ASSOC.)

ARD LAW GROUP PLLC
P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

54.  Ultimately, however, Arizona Rangers elected to ignore the terms of the grants and refused to turn over the unused funds and equipment.

55.  On April 5, 2019 WEC filed a lawsuit against Arizona Rangers ("the WEC lawsuit") in the U.S. District Court of Arizona (Case No. 2:19-cv-02235-SMB).

56.  During the lawsuit, Arizona Rangers hid the fact that its own CPAs had already determined that Mr. Winthrop had not engaged in any wrongdoing.

57.  Instead, Arizona Rangers broadcast the false statements by Fogleton, even though Fogleton had never even met Mr. Winthrop and had a history of dishonesty which had resulted in his termination from at least two law enforcement agencies.

58.  The WEC Lawsuit was brought during a court pilot program requiring voluntary disclosure of documents relating to litigation.

59.  Despite that heightened obligation beyond even the usual Civil Rules, Arizona Rangers concealed the existence of the Grant Program Report.

60.  After WEC sued, Arizona Rangers decided to try to win dirty, knowing that it was in the wrong.

61.  Jared Simmons, general counsel to Arizona Rangers, called Mr. Winthrop and expressly threatened to initiate litigation against Mr. Winthrop unless he could convince WEC to voluntarily dismiss its claims against Arizona Rangers.

62.  Mr. Simmons's status at Arizona Rangers is a moving target because he is sometimes referred to as Arizona Rangers' general counsel but at other times Arizona Rangers claims it does not have a general counsel.

63.  Mr. Simmons made the threat on behalf of Arizona Rangers in an attempt to profit from the fact that Mr. Winthrop's father, John Winthrop, serves as WEC's general counsel.

64.  Mr. Simmons's threat on behalf of Arizona Rangers was made with complete knowledge that Arizona Rangers' CPAs Grant Program Report had concluded that Mr. Winthrop had not engaged in any wrongdoing.

STATEMENT OF CLAIMS - 7

*Mr. Winthrop v. Arizona Rangers (Am. Arb. Assoc.)*

ARD LAW GROUP PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

65. In fact, Mr. Simmons was in attendance at the Board of Director meetings when Arizona Rangers' CPAs provided their report exonerating Mr. Winthrop.

66. On May 31, 2019, after Mr. Winthrop refused to give into the threat, Mr. Simmons, as lead counsel for Arizona Rangers, filed an Amended Answer to Complaint *and* Third-Party Complaint against Mr. Winthrop.

67. To find a basis to sue Mr. Winthrop, Arizona Rangers relied on Fogelton, their Director of Education.

68. Simmons knew, Arizona Rangers knew, and every member of its Board knew or should have known, that Fogelton had been fired by the ATF for using government computers for child pornography and then been fired from Fort Worth PD for lying about his termination from the ATF.

69. Arizona Rangers nonetheless relied on his made up stories to find a basis to sue Mr. Winthrop.

70. Arizona Rangers also "lost" all evidence exonerating Mr. Winthrop, likely engaging in wrongful spoliation at a time when it had an affirmative obligation to preserve documents based on its own knowledge that litigation was imminent.

71. The Third-Party Complaint against Mr. Winthrop contained allegations that ignored and contradicted the Grant Program Report and were instead based on the ramblings of child pornographer Fogelton.

72. Significantly, the Third-Party Complaint only targeted Mr. Winthrop (who had been exonerated) and entirely ignored East Valley Company Commander Jeff East (who had not been exonerated).

73. The Third-Party Complaint also contained allegations that were false but that were designed to give unwarranted credibility to Arizona Rangers.

74. For example, the Third-Party Complaint alleged that: "Arizona Rangers is a non-profit, uniformed law enforcement auxiliary that reports to the Governor of Arizona."

---

STATEMENT OF CLAIMS - 8

*MR. WINTHROP V. ARIZONA RANGERS* (AM. ARB. ASSOC.)

ARD LAW GROUP PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

75.   On June 26, 2020, nearly thirteen months later, Arizona Rangers renewed its allegation that it reported to the Governor of Arizona when Arizona Rangers filed its Amended Third-Party Complaint against Mr. Winthrop.

76.   On November 09, 2021, more than twenty-nine months after its initial filing, Arizona Rangers continued to renew its allegation that it reported to the Governor of Arizona when Arizona Rangers filed a Second Amended Third-Party Complaint against Mr. Winthrop.

77.   Each version of the Third-Party Complaint asserted claims that were known to be false, including factual allegations and claims asserting that Mr. Winthrop had breached a fiduciary duty to Arizona Rangers, had been negligent in handling of funds, and that Mr. Winthrop should be required to indemnify Arizona Rangers.

78.   Ultimately, it turned out that the Rangers never reported to the Governor of Arizona.

79.   Arizona Rangers simply made that up, and included it in pleadings in federal court to make it look more substantial and to curry favor with the court.

80.   Noticeably absent from the Third-Party Complaint were any allegations that any other Ranger, including any officers from the East Valley Company identified in the Grant Program Report, including Jeff East, had engaged in any wrongdoing.

81.   In fact, Jeff East was actually promoted within Arizona Rangers while Mr. Winthrop was sued, notwithstanding the Grant Program Report's conclusion that Mr. Winthrop had not engaged in any wrongdoing and Jeff East potentially breached his fiduciary duty to Arizona Rangers.

82.   In fact, the entire Third-Party Complaint was limited to alleging unsupported and already disproven supposed bad acts only by Mr. Winthrop, who was a mere Associate Ranger, held no voting rights, and who actually recommended the donations to be made to Arizona Rangers.

83.   The only reason for Arizona Rangers' targeting Mr. Winthrop in the Third-Party Complaint was that fact that he was related to WEC's general counsel.

Statement of Claims - 9

*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

84. Throughout the WEC lawsuit, Arizona Rangers' counsel went so far as to represent in open court that: "I want to make sure it's clear our claims against Mr. Winthrop is **we're not alleging he did anything wrong.**"

85. Arizona Rangers knew Mr. Winthrop had not engaged in any wrongdoing at the time they filed the Third-Party Complaint against Mr. Winthrop.

86. In light of the Grant Program Report that was initially hidden from Mr. Winthrop, and the statements by Arizona Rangers' counsel in open court, at no point did Arizona Rangers have probable cause for asserting claims against Mr. Winthrop.

87. Instead, Arizona Rangers acted with malice in an improper attempt to use Mr. Winthrop to seek dismissal of WEC lawsuit, just as they had threatened before bringing their counterclaims.

88. Arizona Rangers also acted with malice and with an evil mind toward Mr. Winthrop throughout the litigation.

89. For example, WEC, Mr. Winthrop, and Arizona Rangers participated in an early mediation with a private mediator.

90. While Arizona Rangers appeared at the mediation, they did so without someone authorized to resolve any claims.

91. After the mediation, Mr. Winthrop's counsel made a walk-away settlement offer to Arizona Rangers, which was refused by Arizona Rangers despite the fact that the Grant Program Report exonerating Mr. Winthrop had been discovered.

92. Arizona Rangers rejected Mr. Winthrop's settlement offer even though they were aware their complaint was not meritorious.

93. Arizona Rangers proceeded to litigate its non-meritorious claims against Mr. Winthrop in a manner that would maximize the expense incurred by Mr. Winthrop.

94. For example, while every Ranger takes an oath requiring they respond to the Arizona Rangers' militaristical "chain of command," Arizona Rangers asserted in the litigation that

---

Statement of Claims - 10

*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

it could not control its volunteers and that Mr. Winthrop would be required to take third-party discovery against each specific Ranger.

95.  Arizona Rangers also objected to the scope of discovery to try and limit Mr. Winthrop's ability to serve the specific Rangers with subpoenas, despite the fact that Arizona Rangers refused to simply order the Rangers to produce documents in their possession and control.

96.  But once a Ranger received a subpoena, Arizona Rangers was ready to assist in responding, which included at least one instance of reducing the production of documents responsive to one subpoena from multiple banker boxes to slightly more than 100 pages.

97.  Arizona Rangers also falsely asserted in its discovery responses that it did not have a central document repository.

98.  That assertion was proven false when its Rule 30(b)(6) designee—one of Arizona Rangers' CPAs who prepared the Grant Program Report—testified that such a facility existed.

99.  Even with this admission, Arizona Rangers delayed any search of the document repository using a litany of excuses.

100.  Arizona Rangers' counsel ultimately visited the document repository and reported that there were no documents relating to the East Valley Company dated after 2010. Counsel offered no explanation for where the relevant documents might have gone.

101.  Arizona Rangers' counsel's statement directly contradicted Arizona Rangers' Rule 30(b)(6) designee's testimony under oath.

102.  Taken together, Arizona Rangers' Rule 30(b)(6) designee and its counsel's representation indicates that Arizona Rangers destroyed evidence that directly addressed the underlying facts in the litigation.

103.  Mr. Winthrop was exceptionally concerned and distraught upon learning of Arizona Rangers' third-party complaint against him.

104.  Arizona Rangers further delayed the litigation by filing a Second Amended Third-Party Complaint after the close of discovery that raised, for the first time, an affirmative defense of illegality.

Statement of Claims - 11

Mr. Winthrop v. Arizona Rangers (Am. Arb. Assoc.)

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

105. Arizona Rangers' illegality defense was without merit and only filed to further mischaracterize Mr. Winthrop as engaging in illegal acts while the Grant Program Report had held otherwise.

106. This non-meritorious amendment further delayed Mr. Winthrop's ability to apply for his bar license in a new state or to obtain malpractice insurance.

107. Moreover, the non-meritorious amendment was filed with an evil mind, was designed to harm Mr. Winthrop, and to require Mr. Winthrop to incur even more expense defending against frivolous claims.

108. Mr. Winthrop was upset by the filing of the Third-Party Complaint because he had moved to the State of Washington and was interested in applying to the state bar to continue the practice of law.

109. The rules of professional conduct impose heightened standards for the honesty, conduct, candor, and fiduciary responsibilities of attorneys.

110. Mr. Winthrop was concerned that the knowingly false allegations made by Arizona Rangers in the Third-Party Complaint would prevent him from receiving approval from Washington's character and fitness committee.

111. In fact, Mr. Winthrop consulted with an attorney prior to filing any bar application to the State of Washington.

112. Mr. Winthrop was advised that the allegations in the lawsuit, even though untrue, would be cause for concern to the Washington State Bar.

113. Of particular concern was Arizona Rangers' false statement in its Third-Party Complaint that Arizona Rangers reported to the Governor of Arizona.

114. This particular allegation improperly asserts that Mr. Winthrop had engaged in misconduct by a governmental entity that reports to the Governor of Arizona.

115. Given the substantial risk of being denied admission to the Washington bar pending the result of Arizona Rangers' knowingly false allegations, Mr. Winthrop was advised to wait for the litigation to terminate prior to submitting his bar application.

STATEMENT OF CLAIMS - 12
*Mr. Winthrop v. Arizona Rangers (Am. Arb. Assoc.)*

ARD LAW GROUP PLLC
P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

116.   Because Mr. Winthrop was already licensed as an attorney in New Hampshire, he also explored serving as inside counsel to a corporation as an alternative, but was told that the pending litigation would also impede his ability to receive malpractice insurance.

117.   Without a valid Washington bar license, and without the ability to obtain insurance, Mr. Winthrop could not obtain work as an attorney.

118.   On the advice of counsel, Mr. Winthrop delayed his professional activities as an attorney by delaying his application to the Washington State Bar as he awaited the resolution of Arizona Rangers' suit against him.

119.   Because of the delay, Mr. Winthrop was unable to apply to the State Bar of Washington and unable to obtain malpractice insurance, causing him to forego various offers of employment conditioned upon his ability to be properly licensed and insured, including through passing the character & fitness application.

120.   This delay cost him at least $11,540/month plus advancement opportunities and career development.

121.   The lawsuit has also caused significant stress to Mr. Winthrop.

122.   Mr. Winthrop ultimately prevailed on the claims asserted by Arizona Rangers.

123.   Because the litigation resulted in a finding that Mr. Winthrop had not committed any wrongdoing—as Arizona Rangers knew all along—the litigation terminated in his favor. And, as the Ninth Circuit held, Arizona Rangers failed to obtain the indemnification that was the ostensible objective of their third-party claims.

124.   Indeed only after the 9th Circuit reversed was Mr. Winthrop able to get his license in Wyoming, some eight years after the beginning of the Arizona Rangers' wrongful campaign against him.

## IV.  First Claim For Relief: Wrongful Institution Of Civil Proceedings

125.   Mr. Winthrop incorporates by reference the statements and allegations contained in the preceding paragraphs.

Statement of Claims - 13

*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

126.   Arizona Rangers instituted a civil action against Mr. Winthrop on May 31, 2019.

127.   Arizona Rangers lacked any legitimate basis to assert breach of fiduciary duty, negligence, or common law indemnity claims against Mr. Winthrop because they were aware and specifically expressed belief that Mr. Winthrop had not engaged in any wrongdoing or acted in any improper manner while an Associate Ranger volunteer at Arizona Rangers.

128.   Arizona Rangers did not have a subjective belief that Mr. Winthrop had any fault as it pertained to WEC's allegations.

129.   Arizona Rangers filed suit against Mr. Winthrop solely to pressure him to persuade his father, WEC's general counsel, to dismiss or settle the WEC lawsuit.

130.   Because Mr. Winthrop was not found to have any liability to Arizona Rangers, the litigation resolved in his favor.

131.   As a direct and proximate cause of Arizona Rangers' filing of its Complaint against Mr. Winthrop for the improper purpose and without any factual basis, Mr. Winthrop suffered economic, consequential, and general damages due to being forced to delay his professional activities.

132.   As a direct and proximate cause of Arizona Rangers' malicious filing of its Third-Party Complaint against Mr. Winthrop, Mr. Winthrop suffered harm to his reputation, his career development was hampered, and he experienced emotional distress.

133.   Arizona Rangers' filing of the Third-Party Complaint was done with an evil mind, to serve its own interests, and with a conscious disregard of Mr. Winthrop's rights and interests. Accordingly, Mr. Winthrop is entitled to an award of punitive damages against Arizona Rangers in an amount sufficient to punish and deter Arizona Rangers and other similarly situated companies from engaging in similar conduct in the future.

## V.  Second Claim For Relief: Tortious Interference

134.   Mr. Winthrop incorporates by reference the statements and allegations contained in the preceding paragraphs.

135.   Arizona Rangers knew that Mr. Winthrop was a lawyer.

---

Statement of Claims - 14

*Mr. Winthrop v. Arizona Rangers (Am. Arb. Assoc.)*

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

136.    Arizona Rangers knew that Mr. Winthrop sought admission to additional state bars.

137.    Arizona Rangers knew that its false claims of financial wrongdoing by Mr. Winthrop would preclude, or at least were likely to preclude, his admission to state bars as long as its claims remained pending in federal court.

138.    Arizona Rangers also knew that its false presentation of itself as "reporting" to the Governor of Arizona gave a veneer of additional credibility to its claims, and further tarnished Mr. Winthrop's reputation, particularly as to character & fitness regimes for state bar associations.

139.    Arizona Rangers knew that their conduct would preclude Mr. Winthrop from gaining admission to additional state bars and thereby impede his ability to procure gainful employment in his chosen profession.

## VI.  Third Claim For Relief: Fraud

140.    Mr. Winthrop incorporates by reference the statements and allegations contained in the preceding paragraphs.

141.    The Rangers claimed to be a legitimate law enforcement support auxiliary, reporting to the Governor of Arizona in an effort to get grants funds directed to them from donors advised by Mr. Winthrop.

142.    The Rangers never reported to the Governor of Arizona.

143.    Mr. Winthrop relied on this when advising the donor funds he worked with to direct grants to Arizona Rangers.

144.    Had Mr. Winthrop known the Rangers were a false front doing no charitable work and performing security for for-profit businesses and partisan election support he would never have given his time.

145.    Had Mr. Winthrop known the Rangers were a front doing little to no charitable work and mostly performing security for for-profit businesses and election support he would never have recommended any fund direct donations to Arizona Rangers.

Statement of Claims - 15

*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC

P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

146.    Arizona Rangers' false statements as to its structure and purpose directly led to the fiasco detailed herein, and its repetition of that falsehood in federal court pleadings increased the harm caused by Arizona Rangers to Mr. Winthrop.

## VII.  Prayer For Relief

WHEREFORE, Mr. Winthrop demands an award in his favor and against Arizona Rangers for compensatory damages in an amount to be determined, but no less than $2,500,000.00, punitive damages, and an award of his attorneys' fees and costs, as well as all other and further relief deemed just and proper.

///

///

///

///

///

///

///

June 12, 2025.


Ard Law Group PLLC

By:  _____

Joel B. Ard, WSBA # 40104
P. O. Box 281
Kingston, WA 98346
206.701.9243
Joel@Ard.law
Attorneys For Claimant

Statement of Claims - 16

*Mr. Winthrop v. Arizona Rangers* (Am. Arb. Assoc.)

Ard Law Group PLLC
P.O. Box 281
Kingston, WA 98346
Phone: (206) 701-9243

# EXHIBIT C



AMERICAN
ARBITRATION
ASSOCIATION®  |  INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

1101 Laurel Oak Road
Suite 100
Voorhees, NJ 08043

April 4, 2025

Joel B. Ard, Esq.
Ard Law Group PLLC
PO Box 281
Kingston, WA 98346
Via Email to: joel@ard.law

Arizona Rangers
6801 North Glen Harbor Boulevard
Suite 109
Glendale, AZ 85307
Via Mail

**Case Number: 01-25-0001-1988**

**Grant Winthrop**
**-vs-**
**Arizona Rangers**

Dear Parties:

The Claimant has filed with us a Demand for Arbitration. The American Arbitration Association ("AAA") has determined that this arbitration arises out of a consumer agreement and, as such, the Consumer Arbitration Rules ("Consumer Rules") apply to this dispute. The Consumer Rules may be found on our website at www.adr.org.

Under R-12 of the Consumer Rules, businesses that provide for AAA arbitration in a consumer contract are obligated to submit their current or proposed consumer agreements to the AAA for review and inclusion on the Consumer Clause Registry ("Registry"). The AAA reviews the agreement for material compliance with the due process standards of the Consumer Due Process Protocol ("Protocol") and the Consumer Rules. The AAA's review is administrative; it is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable, nor is it a determination regarding the arbitrability of the dispute.

This business has not previously submitted its consumer arbitration clause for review. As such, the AAA will review the clause for this matter on an expedited basis. The additional fee for this expedited review is $300, payable by the business.

**The business is also directed to submit its current consumer arbitration clause for inclusion on the Registry at** https://www.adr.org/Consumer at which time the business will also incur a $600 Registry fee. Once the business' clause is registered, it will no longer be assessed the $300 additional expedited review fee on each consumer case filed.

Under the Consumer Rules, the consumer pays a filing fee of $225 and the business pays a filing fee of $375. We received the consumer's $225 portion of the filing fee. So that the filing requirements are complete, **the business is requested to submit filing fees of $375 and the expedited consumer clause review fee of $300, totaling $675**.

**Please note payment should be submitted by credit card or electronic check. Please confirm the email address AAA may send a secured Paylink with instructions to submit payment via either method. In the**

event, a check is the only method that you can provide payment, please make the check payable to the American Arbitration Association and include a reference to the case number. Checks should be mailed to 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. In the event that payment is being made by a third party, such as an insurance company, please request that payment be sent directly to the business' representative. The business' representative should then forward payment to the AAA in accordance with the foregoing instructions.

**The requested payment should be received no later than <u>May 5, 2025</u>** or the AAA may decline to administer this dispute if the business does not timely respond. Please be advised this is the final due date for the requested above.

It should be noted that the consumer's satisfaction of the filing requirements triggers the business' obligation to promptly pay its share of the filing fees under the rules and the business may owe all or a portion of the filing fees even if the matter is settled or withdrawn. The AAA will refund any overpayments received from the consumer with the filing.

<u>No answering statement or counterclaim is due at this time. The parties will be notified of the applicable deadlines upon satisfaction of all the filing requirements</u>.

**PLEASE NOTE: The parties will not be able to view the case on the AAA dashboard until all of the filing requirements from both parties have been met and it has been assigned to a case manager. Once it is assigned to a case manager, the parties will be able to see the case on the website when you log in.**

Thank you for your attention to this matter. If you have any questions, please contact us.

Sincerely,

Consumer Filing
Email: ConsumerFiling@adr.org
Fax: (877)304-8457

# EXHIBIT D



AMERICAN
ARBITRATION
ASSOCIATION® | INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

1101 Laurel Oak Road
Voorhees, NJ 08043

May 6, 2025

Joel B. Ard
Ard Law Group PLLC
PO Box 281
Kingston, WA 98346
Via Email to: joel@ard.law

Arizona Rangers
6801 North Glen Harbor Boulevard
Suite 109
Glendale, AZ 85307
Via Mail

**Case Number: 01-25-0001-1988**

Grant Winthrop
-vs-
Arizona Rangers

Dear Parties:

As of this date we have not received the required fees from the business in this matter. Accordingly, we must decline to administer this case and have closed our file. According to R-1(d) of the Consumer Arbitration Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution.

Any payment submitted by a party will be refunded shortly.

Additionally, and because the business' failure to remit the foregoing constitutes a failure to adhere to our policies regarding consumer claims, we may decline to administer future consumer arbitrations involving Arizona Rangers. The AAA's consumer policies can be found on the AAA's website, www.adr.org. We request that the business remove the AAA name from its consumer arbitration clause so that there is no confusion to the public regarding our decision.

If the business advises the AAA in the future of its intention to comply with the AAA's Consumer Arbitration Rules and if applicable, resolves any outstanding payment obligations, the AAA may consider at its sole discretion, accepting newly filed consumer cases going forward.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the date of this letter.

If you have any questions, please email ConsumerFiling@adr.org.

Sincerely,

Consumer Filing Team
Email: ConsumerFiling@adr.org
Fax: (877)304-8457